Brian S. King, #4610
Brent Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID P., and L. P.,<br><br>            Plaintiffs,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, MORGAN STANLEY CHIEF HUMAN RESOURCES OFFICER, and the MORGAN STANLEY MEDICAL PLAN,<br><br>            Defendants. | COMPLAINT<br><br>Case Number 2:19-cv-00225 JNP |

Plaintiffs David P. ("David") and L. P. ("L."), through their undersigned counsel,

complain and allege against Defendants United Healthcare Insurance Company ("United"), the

Morgan Stanley Chief Human Resources Officer ("MSCHRO"), and the Morgan Stanley

Medical Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1.  David and L. are natural persons residing in Middlesex County, Massachusetts David is

    L.'s father.

1

2. United is an insurance company headquartered in Hennepin County, Minnesota and was the third-party claims administrator for the Plan during the treatment at issue in this case.

3. At all relevant times United acted as agent for the Plan and MSCHRO.

4. MSCHRO was the designated administrator for the Plan.

5. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). David was a participant in the Plan and L. was a beneficiary of the Plan at all relevant times.

6. L. received medical care and treatment which United is responsible to cover, at Summit Achievement ("Summit") from November 28, 2016, to February 13, 2017, and Uinta Academy ("Uinta") from February 14, 2017, to November 30, 2017.[1] Summit and Uinta are treatment facilities which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. Summit is located in Maine and Uinta is located in Utah.

7. United, acting in its own capacity, or through its subsidiary and affiliate United Behavioral Health ("UBH"), or under the brand name Optum, denied claims for payment of L.'s medical expenses in connection with her treatment at Summit and Uinta. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse David for the medical expenses he has incurred and paid for L.'s treatment.

8. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because UBH has a

---

[1] L. remained in treatment at Uinta following November 30, 2017, but David and L. terminated their coverage under the Plan after that date. This lawsuit only seeks recovery of benefits during the timeframe that David and L. were participants and beneficiaries under the Plan.

claims processing center in Utah, and a significant portion of the treatment at issue took place in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

10. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages pursuant to 29 U.S.C. §1132(c) based on the failure of the agents of MSCHRO as Plan administrator, to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### L.'s Developmental History and Medical Background

11. In the fourth grade, L. was diagnosed with Attention Deficit Disorder. She was a very active girl, and enjoyed playing soccer, hockey, baseball, and softball. Although L.'s ADD made it difficult for her to concentrate and caused her to be disruptive in class, she tended to perform well academically. L. was relatively well adjusted until she entered high school, after which she became increasingly isolated and drifted apart from her old friends.

12. L. played varsity sports in field hockey, softball, and hockey. Because of her skill level, she primarily played with older teammates. L. started experimenting with drug use with these older peers, and her usage quickly intensified.

13. L. suffered from anxiety. On one occasion, she self-harmed by burning herself on her arm with a cigarette and then shared a photo of this with her teammates. L. started skipping classes and told the school nurse that she was hearing voices in her head. The nurse recommended that L. be brought to a treatment center for evaluation.

14. L. started seeing a new therapist and a new prescribing doctor. The doctor adjusted L.'s medications, but L. and the doctor got in a disagreement and she stormed out of the office and refused to see her doctor or her therapist again. L. started seeing a new therapist, clinical neuropsychologist Dr. Robert Weaver.

15. While L.'s behavior seemed to improve at times, whenever she was confronted with a stressful event, she behaved erratically. L.'s high school hockey coach called David multiple times because he was concerned about her. Before one game L. became so upset that she was weeping uncontrollably and rocking on the floor. She was suspended from the first six games of softball season, and then quit the team after a teacher discovered alcohol in L.'s backpack.

16. L. became increasingly withdrawn and her drug use escalated, L. even started driving while intoxicated and got into an accident while high. She tattooed herself and self-harmed by cutting. She continued to see Dr. Weaver who recommended that L. receive hospitalization as he opined that L.'s drug use and self-harming behaviors posed a threat to L.'s safety and the safety of others.

17. As L. entered her junior year of high school, she suffered from severe anxiety attacks and repeatedly had to be picked up from school. On one occasion, the school nurse recommended that L. be placed in a psychiatric facility after L. told her that she heard screaming in her head and that she couldn't make it stop. L. was again given a

psychological evaluation and was told that she would need hospitalization if her behavior did not improve.

18. L.'s cutting, drug use, and self-destructive behavior continued to escalate. She would punch holes in the walls when she got angry. L. cut herself so deeply that Dr. Weaver warned that she was at risk of suicide if she did not receive immediate treatment.

**Summit**

19. L. was admitted to Summit on November 28, 2016.

20. In a series of Explanation of Benefits ("EOB") statements, United denied L.'s claims citing denial code LU and a lack of preauthorization. The EOB's stated in part:

> LU- According to our records, we did not receive notification or issue a prior authorization for this service as required by your plan. Therefore, benefits are not available. Future services may be considered for payment if the required notification or prior authorization is obtained.

21. David submitted a level one member appeal of the denial of L.'s treatment on September 18, 2017. He wrote that while United had denied payment for L.'s treatment due to a lack of preauthorization, the Plan did not list residential treatment as a service that required preauthorization. He requested that a retrospective review of the denial be performed to correct the error.

22. David requested that in the event that the denial was maintained that United provide him with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any mental health and substance abuse treatment criteria, including skilled nursing and rehabilitation facility criteria, and any reports or opinions provided from any physician or other professional about this claim. (Collectively "the Plan Documents")

23. In a letter dated October 18, 2017, United upheld the denial of L.'s treatment at Summit. The reviewer gave the following justification for upholding the denial:

> …The non-coverage determination for Residential Level of Care will be upheld on 11/28/2016 and forward. This is based on Optum Level of Care Guidelines for Residential Treatment of Mental Health Disorders and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Level of Care Guidelines. There is no clinical information received that indicates that your daughter required 24 hour monitoring to treat acute mental health symptoms. She did not want to hurt herself. She did not want to hurt others. It seems that her mood and anxiety symptoms could have been treated in a less intensive setting. …

24. United failed to produce a copy of the Plan Documents the Plaintiffs had requested.

25. On December 11, 2017, David requested a level two appeal of the denial of L.'s treatment at Summit. David argued that United had violated his ERISA rights, and stated that L. continued to suffer from a variety of issues that made it unsafe for her to discharge. He wrote that she found ways to engage in acts of self-harm even while in a heavily monitored environment at Summit, such as removing screws from the windows and using them to cut herself. In addition, he stated that she only made very gradual progress in the program and was not able to finish and was instead transferred to Uinta.

26. David included several letters of medical necessity with the appeal as well as an updated copy of L.'s medical records. He argued that it was clear from the clinical evidence and was the opinion of L.'s treatment team that her treatment at Summit was medically necessary. He wrote that the conditions L. suffered from such as Borderline Personality traits, self-harm, and chemical dependency were conditions that take a great deal of time to properly address and required long-term care for any significant progress to be made.

27. David contended that L. met United's guidelines for residential treatment, including its medical necessity guidelines; this was especially true given that she presented a risk to her own safety by actively self-harming and expressing suicidal ideation. David wrote

that this directly contradicted United's assertion that "She did not want to hurt herself."
He argued that United had acknowledged the medical necessity of L.'s continued
treatment after the fact by approving a portion of her stay at Uinta after she was
discharged from Summit.

28. David asserted that L.'s treatment was consistent with generally accepted standards of
medical practice and that United had failed to take into account the fact that L. had a dual
diagnosis of mental health and substance use issues. He wrote that both of these factors
needed to be taken into account to properly evaluate the medical necessity of her
treatment.

29. In addition, he wrote that United was in violation of MHPAEA as it imposed stricter
requirements such as, "self-harm, suicidal ideation, psychosis, crisis, and hallucinations"
on its mental health treatment that were not also required for comparable medical or
surgical treatments such as inpatient rehabilitation or skilled nursing care.

30. He again asked United to provide him with the Plan Documents he had previously
requested.

31. In a letter dated January 12, 2018, United upheld the denial of payment for L.'s
treatment. The reviewer gave the following justification for upholding the denial:

> You were admitted to a therapeutic boarding school, Summit Achievement. After
> reviewing the appeal documents, there was no clinical information provided to
> support the medical necessity for treatment in a psychiatric residential setting or
> to document the daily provision of residential treatment services.

32. United failed to produce a copy of the Plan Documents the Plaintiffs had requested.

33. On March 19, 2018, David requested that the denial of L.'s treatment at Summit be
evaluated by an external review agency. He argued that his appeal had not been given a
full, fair, or thorough review, as required by ERISA as United had, in essence, responded

7

to his 23 page appeal with what he termed as an arbitrary single paragraph denial. In addition, he argued that the United reviewer Dr. Collopy did not have the necessary specialization in child and adolescent psychiatry to properly conduct the review.

34. As United and MSCHRO had once again failed to produce the Plan Documents, including the criteria for skilled nursing and rehabilitation facilities that David had repeatedly requested, he again asked to be provided with a copy.

35. On May 25, 2018, the external review agency upheld the denial of treatment at Summit. The reviewer contended that because L. only had "a single transient bout of suicidal ideation" with an episode of cutting, and because she denied pervasive suicidal ideation and was not psychotic, aggressive, or unable to do activities of daily living, she did not meet the Plan's requirements for medical necessity. The reviewer then wrote:

> The Plan states medically necessary services and supplies are those that are:
>
> - Provided for the diagnosis, treatment, cure or relief of a health condition, illness, injury or disease;
> - Not for experimental, investigational or cosmetic purposes;
> - Necessary for and appropriate to the diagnosis, treatment, cure or relief of a health condition, illness, injury, disease or its symptoms;
> - Within generally accepted standards of medical care in the community; and
> - Not solely for the convenience of the employee, the employee's family or the provider. [3,4][2]
>
> The request fails to meet the definition above. Specifically, the residential treatment was not necessary or appropriate for this patient's treatment, and appears to have been provided for convenience. The patient was medically stable. There were no drug withdrawal symptoms noted, and she was tolerating the prescribed psychotropic medication without significant untoward side effects. As a result, the patient's treatment could have taken place in a less restrictive setting, such as a partial hospitalization program, which would have been more appropriate for her treatment on the dates of service in question. …

---

[2] The denial letter does not specify what these numbers refer to, they appear to reference some internal criteria.

## Uinta

36. On the recommendation of her treatment team, and with United's approval, L. was

    admitted to Uinta on February 13, 2017.

37. In a letter dated March 2, 2017, United denied payment for L.'s treatment from February

    22, 2017, forward. The reviewer gave the following justification for the denial:

    > …Based on the Optum Level of Care Guideline for the Mental Health Residential
    > Treatment Center Level of Care, it is my determination that no further
    > authorization can be provided from 02/22/2017, forward.
    >
    > Your child was admitted for treatment of impaired behaviors. After talking with
    > your child's provider' [sic] designee, it is noted your child has made progress and
    > that her condition no longer meets Guidelines for further coverage of treatment in
    > this setting. Your child's mood is more stable. She is participating in her
    > treatment. She is not having any serious mental health issues. She no longer needs
    > the 24/7 care of a Residential setting. Your child could continue care in the
    > Mental Health Partial Hospitalization Program setting. …

38. On August 28, 2017, David submitted a level one appeal of the denial of L.'s treatment at

    Uinta. David wrote that United had violated his ERISA rights, and argued that the one

    week of treatment that United had approved was not sufficient to resolve the litany of

    behavioral, substance abuse, and mental health issues that L. suffered from.

39. David included several letters of medical necessity with the appeal. In a letter dated

    January 9, 2017, Dr. Robert Weaver wrote in part:

    > [L.] has a history of self-destruction symptomology. Despite psychological and
    > medical treatment her depressive symptoms persisted and limited her functioning
    > socially, within the family, and at school. She had numerous episodes of cutting,
    > driving to endanger, being uncooperative and oppositional at home and in the
    > community and has had significant opioid drug involvement.
    >
    > On numerous occasions I recommended hospitalization as I feared that she might
    > be a danger to herself or others. Outpatient therapy and psychopharmacological
    > treatment with [L.] and her family were insufficient to address her emotional,
    > psychological and physical needs. …

> It remains clear, that [L.] will require longer-term residential therapeutic treatment.

Caitlyn Cook LCPC-C, ATR-BC, LCAT, one of L.'s therapists at Summit wrote in a letter dated January 10, 2017:

> Due to [L.]'s history of self-harm, substance use, risky behavior, and recent identification of emerging Borderline Personality Disorder traits, [L.] will benefit from enrollment in a long-term residential treatment center to improve healthy emotional expression, explore motivations and patterns of relating and to learn positive means of coping and having her needs met.

A Psychological Assessment report conducted by Dr. Todd Corelli and dated December 24, 2016, stated in part:

> In summary, [L.] is a clinically complex adolescent that struggles with several significant issues. She is emotionally immature, has no coping skills, struggles in maintaining her peer relationships, abuses drugs, suffers from depression and anxiety, and is beginning to exhibit features of Borderline Personality Disorder. Given the seriousness of these test findings, it is strongly recommended that following her discharge from Summit Achievement, [L.] go on to a longer-term residential treatment program that can continue addressing each of these issues in depth. …

L.'s discharge summary from Summit, dated March 13, 2017, stated in part:

> In [L.]'s first week, neuropsychological testing was recommended by both this writer and Educational Consultant, Benjamin Mason, to further assess aspects of [L.]'s personality, emotional development and characterological traits. This testing, conducted by Dr. Todd Corelli in [L.]'s third week and referenced above, indicated emerging traits consistent with Borderline Personality Disorder, a lack of healthy coping skills and poor emotional regulation. Accordingly, continued treatment in a long-term residential treatment center was recommended following Summit. …

> [L.]'s progress was largely intermittent due to her inconsistent commitment to treatment. [L.] expressed both a desire to address her personal issues and a resistance to deeply engage in the therapeutic process. Accordingly, [L.] continued to struggle with variable degrees of mood lability, self-harm, and poor emotional regulation throughout her twelve weeks. This was particularly of note in [L.]'s eighth week upon learning that she would be continuing residential treatment after Summit; [L.] refused to participate in programming for four days, prompting a one-on-one intervention, and attempted to use self-harm as a means of "punishing" staff when she did not get her way. …

> [L.] will benefit from enrollment in a residential treatment center to improve
> healthy emotional expression, explore motivations and patterns of relating to
> others and to learn positive means of coping and having her needs met.

In addition, David included a September 20, 2016, psychiatric assessment conducted by

Melinda Trollope, LMHC; an Educational Assessment from Summit dated February 27,

2017, and a Three Year Evaluation conducted by James Stone Ph.D. on October 25,

2016. As well as a copy of L.'s medical records. These records showed that L. continued

to suffer from self-destructive behaviors, desires to self-harm, anxiety attacks, difficulty

coping, aggressiveness, and a desire to use drugs while in treatment.

40. David argued that it was the strong consensus of L.'s treatment team that her residential

treatment was medically necessary, and that if she were discharged prematurely that it

was very likely that she would continue abusing substances and engaging in unsafe

behaviors. He wrote that L. was on the path to recovery at Uinta after she had repeatedly

failed to make progress at a lower level of care. He reiterated that the single week that

United had approved was not nearly enough time for L. to make adequate progress and

was not even enough time for L. to complete the first level of the program.

41. David asserted that United had chosen the February 22, 2017, date to deny care

arbitrarily, as there was nothing about that date that showed that L.'s residential treatment

was no longer necessary, or that she could have been treated in a less restrictive

environment.

42. David wrote that L.'s treatment was medically necessary and that she continued to meet

the Plan's continued stay guidelines and that nothing substantive had changed in the

week since her admission -which United approved- that should have led to a denial of

care. He also brought up the fact that L. had a dual diagnosis of substance abuse and

mental health disorders, and that each of these should have been taken into account

before arriving at the decision to discharge L.

43. David again requested that United provide him with the Plan Documents, although this

time he requested materials pertaining to Uinta instead of Summit.

44. In a letter addressed to Uinta dated September 27, 2017, United upheld the denial. The

reviewer gave the following justification for denying care:

> …I have determined that benefit coverage is **not available** for the following
> reason(s):
>
> Based on the Optum Level of Care Guideline for the Mental Health Residential
> Treatment Center Level of Care, it is my determination that no further
> authorization can be provided from 02/22/2017, forward.
>
> Your child was admitted for treatment of impaired behaviors and poor coping
> skills. After reviewing the available clinical information, it was noted your child
> had made progress and that her condition no longer met Guidelines for further
> coverage of treatment in this setting. Your child's mood was more stable. She was
> participating in her treatment. She was not having any serious mental health
> issues. She no longer needs the 24/7 care of a residential setting. Your child could
> have continued care in a Mental Health Partial Hospitalization Program setting.
> … (emphasis in original)

45. United sent a second letter addressed to Uinta dated January 2, 2018, in which United

upheld the denial of L.'s treatment. The reviewer wrote in part:

> As outlined in the appeal review determination letter sent to you dated
> 09/18/2017, you have up to 60 days from the date you received the letter to
> request appeal/grievance review. We regret to inform you that UBH is unable to
> process the request for an appeal review, as the request was not within the 60day
> [sic] period as outlined in the enclosed Member Appeal/Grievance Rights and
> Instructions.

46. United failed to produce a copy of the Plan Documents the Plaintiffs had requested.

47. On March 19, 2018, David submitted a level two appeal of the denial of L.'s treatment at

Uinta. He argued that United had made several errors when it denied his level one appeal.

He wrote that he had proof that his appeal was submitted and delivered in accordance with the Plan's timely filing requirements.

48. David recounted the timeframes for the denials and appeals as follows: After United failed to respond to his level one appeal, David contacted United through a representative and was told on November 28, 2017, that United was unable to locate the appeal. This was confirmed in another call with a different United representative.

49. After David was informed that United had lost his appeal, he submitted it a second time, and once again confirmed that it was delivered. In a December 12, 2017, call United initially claimed that it had not received the resubmitted level one appeal, but then called back and stated that the appeal had been found.

50. After United failed to respond to the resubmitted appeal, David again reached out to United on March 2, 2018. In this call, the United representative informed David of the existence of the September 27, 2017, and January 2, 2018, denial letters listed above. However, David learned that these denials had only been sent to Uinta, which was why he had never received them. He also discovered that United has mistakenly classified his member appeal as a provider appeal and had then treated the resubmission of his level one appeal as an untimely level two appeal, even though it was clearly marked as a level one appeal and was identical to the first level one appeal that United had already received.

51. David argued that United had failed to follow ERISA regulations and directed it to properly process his appeals. David again requested a copy of the Plan Documents.

52. On April 21, 2018, United sent the Plaintiffs a letter upholding the denial. The reviewer stated in part:

Your [sic] were admitted for treatment of problems with your mood, behavior, and addiction. After reviewing the available information, it is noted you had made progress and that your condition no longer met Guidelines for further coverage of treatment in this setting. You were doing better. You were stable from a medical and mental health standpoint. You were not thinking about hurting yourself or others. You were thinking clearly. You were motivated. You were participating in treatment and using the skills learned. You were able to take care of your needs. You were able to go on leaves of absence. You had family support. You did not require 24 hour nursing care. You could have continued care in the Mental Health Partial Hospitalization Program setting.

53. United failed to produce a copy of the Plan Documents the Plaintiffs had requested.

54. On August 10, 2018, David requested that the denial of L.'s treatment at Uinta be evaluated by an external review agency. He wrote that it was "unreasonable to believe that my daughter's severe symptoms, behaviors, and diagnoses, including reports of auditory hallucinations, self-harm, and drug use could be effectively treated in approximately one week of residential treatment."

55. David restated how United had misprocessed his level one appeal and asked the external reviewer to provide him with a full, fair, and thorough review.

56. He contended that L. met United's criteria for residential treatment upon admission, that United acknowledged this as they initially approved care, and that she continued to meet the criteria for residential treatment. He argued that United had incorrectly utilized acute criteria meant for a higher level of care, such as being an imminent risk of harm, and had oversimplified the treatment provided to L. in order to deny the sub-acute level of care L. received at Uinta.

57. He argued that it would not have been safe for L. to return to outpatient treatment, as she was still at risk for self-harm, and reiterated that L.'s treatment team recommended that she receive further treatment. He wrote that contrary to United's assertion, L. was not thinking clearly and could not have been successfully treated at a lower level of care.

58. He contended that United was in violation of MHPAEA, as it was required to offer coverage of its mental health services "at parity" with any medical or surgical services offered by the Plan. He argued that United had applied a non-quantitative treatment limitation to L.'s residential treatment, and that United applied a stricter standard to its residential treatment services than it applied to comparable services such as skilled nursing and rehabilitation facilities in violation of MHPAEA.

59. He argued that United had repeatedly failed to provide the documentation that he had requested and once again asked for a copy of the Plan Documents.

60. In a letter dated November 8, 2018, the external review agency upheld the denial of payment for L.'s treatment at Uinta. The reviewer wrote in part:

> Based on current evidence-based medical literature, the requested service (mental health residential treatment from 2/22/2017 - 11/30/2017 was not found to be medically necessary.
>
> The clinical information provided does not indicate that the service requested was medically necessary or was likely to be successful in treating the patient's symptoms (5, 6, 8).[3] Treatment at a residential level of care with a 24-hour structured setting is required when there are significant safety concerns that require daily monitoring, significant functional impairments related to behavioral symptoms, including impairments in self-care and activities of daily living, or significant substance use affecting daily functioning (2, 3, 9). Such symptoms include persistent low mood, agitation, aggression (1, 4, 7), persistent active suicidal ideations, symptoms of psychosis or mania, and continued substance use affecting physical and emotional health.
>
> The clinical information reviewed indicates that the patient had no significant ongoing symptoms that required residential treatment level of care between 2/22/2017 and 11/30/2017. She was not reported to have symptoms that would require 24-hour supervision and observation. She did not express any persistent suicidal or homicidal ideations or deemed to be [sic] at significant risk of harm to self or others during her stay at the residential treatment level of care. She was not reported to have any symptoms suggestive of psychosis, including hallucinations, delusions or paranoia. She did not have any symptoms of mania or hypomania.

---

[3] While these numbers appear to reference some sort of internal criteria, the denial letter gives no indication of what they may refer to or how to interpret them. It simply references "applicable criteria sets" and does not expand on what criteria was used, how it was interpreted, or if it conforms with the terms of the Plan.

She did not exhibit any significant agitation or aggression. The patient was not reported to have had any significant substance use over the past several months and there were no reports of any significant urges to engage in the same. The patient had no significant ongoing medical problems that required frequent monitoring. She was not reported to have significant functional impairments and was able to care for herself. The patient did not have any significant adverse effects from her medications. She was not reported to have required any significant changes in her medication regimen. The clinical information reviewed indicates that the patient may have been managed safely in a less restrictive setting and lower level of care such as a partial hospitalization program.

61. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

62. The denial of benefits for L.'s treatment was a breach of contract and caused David to incur and pay medical expenses that should have been paid by the Plan in an amount totaling over $177,000.

63. United acting as agent of MSCHRO, failed on six separate occasions to provide a copy of the Plan Documents in spite of David's repeated requests.

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

64. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

65. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

66. United and the Plan breached their fiduciary duties to L. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in L.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of L.'s claims.

67. The actions of United and the Plan in failing to provide coverage for L.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

**SECOND CAUSE OF ACTION**

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

68. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

69. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

70. Specifically, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

71. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider

specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

72. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for L.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does United exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner United excluded coverage of treatment for L. at Summit and Uinta.

73. The actions of United and the Plan requiring that L. satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

74. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

75. The violations of MHPAEA by United and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan and United insured plans as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

## THIRD CAUSE OF ACTION

### (Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c))

76. United, acting as agent for MSCHRO, the administrator of the Plan, is obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan and United, the medical

necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facilities.

77. United repeatedly failed to produce to the Plaintiffs the documents under which the Plan was operated, including but not limited to any administrative service agreements between the Plan and United, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facility treatment within 30 days after they had been requested.

78. The failure of MSCHRO and its agent United, to produce the documents under which the Plan was operated, as requested by the Plaintiffs, within 30 days of David's September 18, 2017, December 11, 2017, March 19, 2018, appeal letters for Summit or his August 28, 2017, March 19, 2018, and August 10, 2018, appeal letters for Alpine provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this count to improper statutory penalties up to $110 per day from 30 days from the date of each of these letters to the date of the production of the requested documents.

79. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.    Judgment in the total amount that is owed for L.'s medically necessary treatment at Summit and Uinta under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.    Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.    For an award of statutory penalties against MSCHRO of up to $110 a day after the

first 30 days for each instance of United's failure or refusal to fulfill its duties, as

agent of MSCHRO, to provide the Plaintiffs with the documents they had requested.

4.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5.      For such further relief as the Court deems just and proper.

DATED this 3rd day of April 2019.


                                    By _____s/ Brian S. King_____
                                           Brian S. King
                                           Attorney for Plaintiffs



County of Plaintiffs' Residence:
Middlesex County, Massachusetts.