## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DAVID P., and L.P., <br><br>                 Plaintiffs, <br><br> v. <br><br> UNITED HEALTHCARE INSURANCE COMPANY, MORGAN STANLEY CHIEF HUMAN RESOURCES OFFICER, and the MORGAN STANLEY MEDICAL PLAN, <br><br>                 Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** <br><br> Case No. 2:19-cv-00225-JNP-PMW <br><br> District Judge Jill N. Parrish |

Defendants United Healthcare Insurance Company ("United"), Morgan Stanley Chief Human Resources Officer ("MSCHRO"), and the Morgan Stanley Medical Plan (collectively, "Defendants") move to dismiss the Complaint filed by plaintiffs David P. and L.P. (collectively, "Plaintiffs") for failure to state a claim. Plaintiffs' Complaint alleges healthcare insurance coverage violations of the Employee Retirement Income Security Act of 1974 ("ERISA") and the Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act"), an amendment to ERISA. Having considered the parties' briefs and argument advanced at a hearing on January 15, 2020, the court grants in part and denies in part the Defendants' Motion to Dismiss (the "Motion").

## I.    BACKGROUND

Plaintiff David P., an employee of Morgan Stanley, maintained a healthcare insurance policy through a self-funded employee welfare benefits plan entitled the Morgan Stanley Medical Plan (the "Plan"). United operated as the third-party claims administrator for the Plan. MSCHRO was the designated plan administrator for the Plan. Plaintiff alleges that at all relevant times, United acted as an agent for the Plan and MSCHRO. *See, e.g.*, Compl. ¶¶ 3, 10, 63. The Plan covered David P. as the Plan participant and L.P. as his minor daughter and eligible beneficiary. *Id.* ¶ 5.

## A. UNITED'S INSURANCE COVERAGE OF L.P.'S TREATMENT

From an early age, L.P. has been treated for a range of mental health and substance abuse conditions. In the fourth grade, L.P. was diagnosed with Attention Deficit Disorder ("ADD"). *Id.* ¶ 11. L.P.'s symptoms worsened in high school when her drug use intensified and she began experiencing severe anxiety. *Id.* ¶ 12. For example, on one occasion L.P. "self-harmed by burning herself on her arm with a cigarette." *Id.* ¶ 13. On another, she was overcome by her anxiety before a sporting event and was found "weeping uncontrollably and rocking on the floor." *Id.* ¶ 15. L.P. generally would skip class, abuse alcohol at school, tattoo herself, punch holes in the wall when she became angry, and drive while intoxicated, which resulted in at least one serious car accident. *See id.* ¶¶ 14–18. She began self-harming by cutting. *Id.* ¶ 16. And she reported to a school nurse that "she heard screaming in her head and that she couldn't make it stop." *Id.* ¶ 17.

L.P.'s school nurse recommended that she undergo psychological care and potential hospitalization if her symptoms did not improve. *Id.* L.P. began seeing Dr. Robert Weaver, a clinical neuropsychologist, who "recommended that [L.P.] receive hospitalization" because her "drug use and self-harming behaviors posed a threat to [her] safety and the safety of others." *Id.* ¶ 16. After a particularly severe instance of self-harming by cutting, Dr. Weaver warned that L.P. "was at risk of suicide if she did not receive immediate treatment." *Id.* ¶ 18.

Plaintiffs admitted L.P. to a mental health/substance abuse residential treatment program at Summit Achievement ("Summit") in Maine on November 28, 2016. *Id.* ¶ 6. Plaintiffs state that L.P. continued to self-harm while at Summit, such as by "removing screws from the windows and using them to cut herself." *Id.* ¶ 25. Before completing the program at Summit, Plaintiffs transferred L.P. to a different mental health/substance abuse residential treatment program at Uinta Academy ("Uinta") in Utah starting February 14, 2017. *Id.* ¶ 6. L.P. received care at Uinta until November 30, 2017. *Id.* Both Summit and Uinta "are treatment facilities which provide sub-acute

inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems." *Id.*

Plaintiffs filed insurance claims with United for coverage of L.P.'s treatment at Summit and Uinta. United denied paying benefits for all of L.P.'s residential care at Summit and covered one week of her treatment at Uinta. Plaintiffs exhausted internal and external appeals of United's benefits denials, all of which were rejected. *See id.* ¶ 61. Plaintiffs allege that United's denial of benefits for L.P.'s treatment at Summit and Uinta caused Plaintiffs to incur over $177,000 in medical expenses. *See id.* ¶ 62.

### 1. Denial of Coverage for Summit Treatment

Plaintiffs admitted L.P. to Summit on November 28, 2016. *Id.* ¶ 19. In a series of Explanation of Benefits statements, United denied Plaintiffs' claims for benefits because United had not preauthorized the mental health/substance abuse services at Summit. *Id.* ¶ 20. Plaintiffs submitted an initial "level one" appeal of United's coverage denial on September 18, 2017. *Id.* ¶ 21. Plaintiffs contended that the Plan "did not list residential treatment as a service that required preauthorization," and requested that United perform a retrospective review of the denial. *Id.* Plaintiffs also requested that United provide them with copies of their governing "Plan documents," which include the summary plan description, level of care guidelines for the type of coverage at issue, any administrative service agreements, the applicable mental health and substance abuse medical necessity criteria, the applicable medical necessity criteria for analogous skilled nursing and rehabilitation care, and any reports or opinions provided from any physician or other professional about their claim. *Id.* ¶ 22.

In a letter dated October 18, 2017, United upheld its denial of coverage for L.P.'s treatment at Summit based on its medical necessity criteria. *Id.* ¶ 23. The reviewer opined that the Summit treatment was not medically necessary based on United's level of care guidelines because it found

that L.P. "did not want to hurt herself," that "[s]he did not want to hurt others," and that "her mood and anxiety symptoms could have been treated in a less intensive setting." *Id.*

Plaintiffs submitted a twenty-three-page "level two" appeal of United's denial of benefits for L.P.'s treatment at Summit on December 11, 2017. *Id.* ¶ 25. Plaintiffs contended that United violated ERISA by not providing the requested Plan documents, failing to consider L.P.'s dual diagnosis of mental health and substance abuse conditions, and ignoring evidence that supported the medical necessity of L.P.'s treatment at Summit, including her continued self-harming behavior while in the program. *See id.* ¶¶ 25–30. Plaintiffs also stated that United violated the Parity Act because it used stricter criteria for mental health coverage determinations—such as by requiring evidence of "self-harm, suicidal ideation, psychosis, crisis, and hallucinations"—than United would have applied to coverage determinations for analogous medical or surgical care at an inpatient rehabilitation or skilled nursing facility. *Id.* ¶ 29. In support of their appeal, Plaintiffs included letters from L.P.'s care providers and an updated copy of her medical records. *Id.* ¶ 26.

On January 12, 2018, United upheld its denial of benefits for L.P.'s treatment at Summit. *Id.* ¶ 31. The United reviewer stated that Summit was a "therapeutic boarding school" and the Plaintiffs' appeal documents offered "no clinical information . . . to support the medical necessity for treatment in a psychiatric residential setting" such as Summit. *Id.* United again did not respond to Plaintiffs' request for Plan documents and the medical necessity criteria it applied. *Id.* ¶ 32.

Plaintiffs sought an external review of United's benefits denial and reiterated their request for plan documents on March 19, 2018. *Id.* 33. They argued that United failed to "give[] a full, fair, and thorough review" of their claim and that the appeal reviewer lacked "the necessary specialization in child and adolescent psychiatry to properly conduct the review." *Id.* On May 25, 2018, the external review agency upheld United's denial of benefits for L.P.'s treatment at Summit.

*Id.* ¶ 35. The reviewer characterized L.P.'s condition as "medically stable" with only "a single transient bout of suicidal ideation." *Id.* The reviewer concluded that "the residential treatment was not necessary or appropriate for this patient's treatment, and appears to have been provided for convenience." *Id.* The reviewer continued to reference internal criteria in its denial, which Plaintiffs assert they still had not obtained after multiple requests. *Id.*

### 2. Denial of Coverage for Uinta Treatment

Because L.P.'s condition did not improve at Summit, her treatment team recommended that she be transferred and admitted to Uinta on February 13, 2017. *Id.* ¶ 36. Plaintiffs obtained pre-approval from United for L.P.'s treatment at Uinta. *See id.* ¶¶ 27, 36. But in a letter dated March 2, 2017, United stated that it denied benefits for L.P.'s care at Uinta starting February 22, 2017. *Id.* ¶ 37. United's denial letter stated that based on its Level of Care Guidelines, L.P.'s treatment at Uinta was not medically necessary because United found that L.P. "has made progress," her "mood is more stable," "[s]he is participating in treatment," and "is not having any serious mental health issues." *Id.* The United reviewer concluded that L.P. "no longer needs the 24/7 care of a Residential setting." *Id.*

On August 28, 2017, Plaintiffs submitted their level one appeal of United's adverse benefits determination for L.P.'s treatment at Uinta. *Id.* ¶ 38. Plaintiffs stated that United's denial of benefits violated ERISA because covering only one week of treatment was insufficient to address L.P.'s "litany of behavioral, substance abuse, and mental health issues." *Id.* Plaintiffs contended that the February 22, 2017 date that United chose to deny benefits was an arbitrary cutoff because there was no evidence of a change in L.P.'s condition at that time compared to when United preauthorized the same treatment only a week beforehand. *Id.* ¶ 41. Plaintiffs also wrote that United failed to appropriately consider L.P.'s dual diagnosis of mental health and substance abuse issues. *Id.* ¶ 42. And Plaintiffs again requested the Plan documents showing what criteria United used to

make its coverage decisions. *Id.* ¶ 43. In support of their appeal, Plaintiffs included several letters from healthcare providers recommending that L.P. receive continued care at a residential treatment center such as Uinta. A January 9, 2017, letter from Dr. Weaver stated that a lower level of "outpatient therapy and psychopharmacological treatment" was insufficient because of L.P.'s "history of self-destruction symptomology" including "numerous episodes of cutting, driving to endanger, being uncooperative and oppositional at home and in the community," and "significant opioid drug involvement." *Id.* ¶ 39. A Psychological Assessment report conducted by Dr. Todd Corelli from December 24, 2016, concluded that because L.P. "is a clinically complex adolescent that struggles with several significant issues . . . it is strongly recommended that following her discharge from Summit Achievement, [L.P.] go on to a longer-term residential treatment program that can continue addressing each of these issues in depth." *Id.* In addition, one of L.P.'s therapists from Summit, Caitlyn Cook, wrote in a January 10, 2017 letter that "[d]ue to [L.P.]'s history of self-harm, substance use, risky behavior, and recent identification of emerging Borderline Personality Disorder traits, [L.P] will benefit from enrollment in a long-term residential treatment center." *Id.* And her March 13, 2017 discharge summary from Summit stated that L.P. "continued to struggle with variable degrees of mood lability, self-harm, and poor emotional regulation throughout her twelve weeks" at Summit and that "continued treatment in a long-term residential treatment center was recommended following Summit." *Id.*[1]

On September 27, 2017, United upheld its denial of benefits for L.P.'s care at Uinta. *Id.* ¶ 44. The reviewer concluded that based on United's Level of Care Guidelines, treatment at Uinta

---

[1] Plaintiffs' level one appeal of United's denial of benefits for L.P's Uinta treatment also included updated copies of L.P.'s medical records, a September 20, 2016 psychiatric assessment conducted by Melinda Trollope (a Licensed Mental Health Counselor), a Three-Year Evaluation conducted by James Stone Ph.D. dated October 25, 2016, and a February 27, 2017 Educational Assessment from Summit. *See* Compl. ¶ 39.

was not medically necessary and L.P. could have received treatment at a lower level of care because United found that L.P.'s "mood was more stable," "[s]he was participating in her treatment," and "[s]he was not having any serious mental health issues." *Id.* United then sent a second denial of benefits letter on January 2, 2018, which stated that United denied Plaintiffs' appeal because it was filed after a sixty-day filing period. *Id.* ¶ 45. United again did not produce a copy of the governing Plan documents and medical necessity criteria that Plaintiffs had requested. *Id.* ¶ 46.

Plaintiffs submitted a level two appeal of United's denial of L.P.'s treatment at Uinta on March 19, 2018. *Id.* ¶ 47. Plaintiffs first wrote that their appeal was timely and any delay was caused by United's administrative errors and misprocessing. *See id.* ¶¶ 48–51. Plaintiffs also reiterated that United improperly found that L.P.'s treatment at Uinta was not medically necessary. *Id.* ¶ 47. On April 21, 2018, United upheld the denial of benefits for L.P.'s Uinta treatment. *Id.* ¶ 52. United's level two denial stated in part that L.P. "no longer met Guidelines for further coverage of treatment in [a residential treatment center] setting" because United concluded that L.P. was "doing better," "motivated," "thinking clearly," "not thinking about hurting [herself] or others," and was "participating in treatment and using the skills learned." *Id.* Again, United did not produce the requested Plan documents or medical necessity criteria. *Id.* ¶ 53.

On August 10, 2018, Plaintiffs sought an external review for L.P.'s Uinta treatment. *Id.* ¶ 54. First, Plaintiffs reiterated that one week of coverage was insufficient to treat L.P.'s "severe symptoms, behaviors, and diagnoses, including reports of auditory hallucinations, self-harm, and drug use," *id.*, and that her condition had not materially changed from when United initial pre-approved benefits for treatment, *id.* ¶ 56. Second, Plaintiffs argued that United's misprocessing of their level one appeal resulted in a deficient review of their claim for benefits. *Id.* ¶ 55. Third, Plaintiffs contended that United violated ERISA and the Parity Act by ignoring medical evidence

that showed L.P. "was still at risk for self-harm" and by applying a nonquantitative treatment limitation to L.P.'s care at Uinta that was stricter than criteria United "applied to comparable services such as skilled nursing and rehabilitation facilities." *Id.* ¶ 58. Fourth, Plaintiff also highlighted that United had repeatedly failed to provide governing Plan documents and the internal criteria that United applied. *Id.* ¶ 59.

On November 8, 2018, the external review agency upheld United's denial of coverage for L.P.'s care at Uinta. *Id.* ¶ 60. The denial relied on undisclosed "applicable criteria sets" to determine the medical necessity of the treatment and concluded that L.P. had not met this unknown coverage criteria because she "did not express any persistent suicidal or homicidal ideations," she "was not reported to have any symptoms suggestive of psychosis, including hallucinations, delusions or paranoia," she "did not have any symptoms of mania or hypomania," and she "was not reported to have had any significant substance use over the past several months." *Id.*

## B. PLAINTIFFS' CLAIMS

Plaintiffs allege that Defendants' claims adjudication processes and decision to deny benefits for L.P.'s treatment at Summit and Uinta violated ERISA in three ways. In their First Cause of Action, Plaintiffs allege that Defendants wrongfully denied benefits for all of L.P.'s treatment at Summit and all but one week of her care at Uinta, and seek damages under 29 U.S.C. § 1132(a)(1)(B). Under this claim, Plaintiffs argue that Defendants improperly applied the terms of the Plan, violated their fiduciary duty under 29 U.S.C. § 1104(a)(1) to "act solely in [L.P.'s] interest," and did not meet their obligation under 29 U.S.C. § 1133(2) to provide a "full and fair review" of Plaintiffs' claims. *Id.* ¶¶ 64–67. Stated differently, Plaintiffs complain that United failed to engage in meaningful dialogue during the appeals process, did not act in L.P.'s interest, and failed to cover medically necessary treatment based on the terms of the Plan.

In their Second Cause of Action, Plaintiffs allege that Defendants violated the Parity Act, a component of ERISA. Plaintiffs allege that Defendants violated the Parity Act by imposing more restrictive or additional treatment limitations on mental health/substance use disorder benefits than the limitations applied to analogous medical/surgical benefits. *Id.* ¶ 70. Specifically, Plaintiffs complain that Defendants required L.P. to "satisfy acute care medical necessity criteria in order to obtain coverage for [subacute] residential treatment" at Summit and Uinta, but would have required subacute criteria if Plaintiffs had sought benefits for care in analogous "subacute inpatient facilities for medical/surgical conditions." *Id.* ¶ 73. To rectify the alleged Parity Act violations, Plaintiffs seek equitable relief under 29 U.S.C. § 1132(a)(3) in the form of judicial declaration, injunction, reformation, disgorgement, accounting, surcharge, restitution, and equitable estoppel.

In their Third Cause of Action, Plaintiffs request statutory penalties under 29 U.S.C. §§ 1132(a)(1)(A) and 1132(c). Plaintiffs argue that ERISA requires plan administrators or their agents to produce certain plan documents and benefits criteria within thirty days of request, and that United failed to provide such documents on six occasions. *Id.* ¶¶ 76–78. Accordingly, Plaintiffs seek an award of statutory penalties against Defendants of up to $110 per day after the first thirty days for each instance in which United failed to provide the Plaintiffs with requested documents.

## II.     LEGAL STANDARD

Defendants move to dismiss Plaintiffs' Complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The burden is on the plaintiff to 'frame a complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma ex rel. Dept. of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). The allegations in the complaint must

be "more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Id.* (quoting *Twombly*, 550 U.S. at 555). In addition, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563. In other words, once a plaintiff adequately states a claim for relief, he or she "must nudge his [or her] claims across the line from conceivable to plausible in order to survive a motion to dismiss." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (alteration and internal quotations omitted).

In considering a motion to dismiss, a district court not only considers the complaint, "but also the attached exhibits," *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011), and the "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court "may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." J*acobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).[2]

## III.    ANALYSIS

In their Motion to Dismiss, Defendants advance four principal arguments in seeking to dismiss all or part of Plaintiffs' Complaint. First, they contend that David P. lacks statutory and constitutional standing to bring his individual claims. Second, Defendants urge the court to dismiss Plaintiffs' Complaint with prejudice (or in the alternative, to enter a stay) because Defendants assert that L.P. is a member of a pending class action that Defendants believe is premised on the

---

[2] Here, Plaintiffs' allegations are based in part upon the terms of the Plan, the United Level of Care Guidelines, and United's denial of benefits letters. Defendants attach many of those documents to their Motion, *see* ECF Nos. 13 & 14, and Plaintiffs do not contest the authenticity of those documents. Therefore, the court considers the Defendants' attachments in evaluating this Motion.

same grounds as this lawsuit. Third, Defendants argue that Plaintiffs' Second Cause of Action alleging violations of the Parity Act is inadequately pled and should be dismissed with prejudice. Fourth, Defendants contend that Plaintiffs' Third Cause of Action for statutory penalties should be dismissed with prejudice because Plaintiffs' requests for documents were directed to the wrong entity or are time-barred. For the following reasons, the court rejects Defendants' first, second, and third arguments, but accepts its fourth argument concerning statutory penalties.

## A. STANDING

The court first addresses David P.'s statutory and constitutional standing to sue under ERISA. Concerning statutory standing, only a "participant or beneficiary" of the Plan may bring a civil action "to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1). ERISA defines "participant" as:

> [A]ny employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

*Id.* § 1002(7). Plaintiffs allege that David P. was the plan participant during all relevant times. Compl. ¶ 5. As a plan participant, David P. "has standing to bring a civil action to enforce his rights under the terms of an ERISA plan or to enforce ERISA's provisions." *Alexander v. Anheuser-Busch Companies, Inc.*, 990 F.2d 536, 538 (10th Cir. 1993) (citation omitted). Moreover, David P. must only have "a colorable claim for vested benefits," *Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1161–62 (10th Cir. 2004) (citation omitted), and "the requirements for a colorable claim are not stringent; [Plaintiffs] need have only a nonfrivolous claim for the benefit in question," *Horn v. Cendant Operations, Inc.*, 69 F. App'x 421, 426 (10th Cir. 2003) (citation omitted). Here, David P.'s First Cause of Action seeks to enforce his rights to recover benefits under his ERISA plan and

his Second and Third Causes of Action seek to enforce two of ERISA's other substantive provisions. Therefore, David P. has statutory standing.[3]

David P. also has constitutional standing. Constitutional standing requires three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized" and "actual or imminent." Second, a causal connection must exist between the injury and the conduct complained of; the injury must be fairly traceable to the challenged action. Third, it must be likely that the injury will be redressed by a favorable decision.

*Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447 (10th Cir. 1996) (citations omitted).

Plaintiffs allege that David P. incurred over $177,000 in medical expenses for L.P.'s care at Summit and Uinta because of Defendants' alleged wrongful denial of benefits. *See* Compl. ¶ 62. "This

---

[3] The court rejects Defendants' proposed statutory standing requirements as overly stringent and inconsistent with the text and purpose of ERISA. First, ERISA permits plan participants to sue to enforce his or her rights "*or to clarify his rights* to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1). Although Plaintiffs in this case have not argued that this provision provides an independent basis for a parent plan participant's statutory standing, the court observes that nothing in ERISA restricts future plaintiffs from making such an argument. Second, David P. had legal obligations to pay for his minor daughter's care during the time Plaintiffs sought benefits for L.P.'s treatment. *See K.K. v. United Behavioral Health*, No. 2:17-CV-01328-DAK, 2020 WL 262980, at *6 (D. Utah Jan. 17, 2020) (unpublished) (collecting cases and finding that a plan participant father "has standing to enforce his rights under the terms of the [P]lan, which includes enforcing his right to obtain coverage for his minor child's medical bills." (citations and quotations omitted)). The fact that L.P. has now become emancipated does not change the nature of her and David P.'s legal relationship during the time Plaintiffs submitted their claims for benefits. Third, the court observes that accepting Defendants' rigorous standing requirement would put Plaintiffs in the untenable position where L.P., as the beneficiary seeking benefits, and David P., as the plan participant who paid for the treatment services, would have either statutory or constitutional standing, but not both. In other words, L.P. would have statutory standing to sue as the beneficiary who is "enforc[ing] his rights under the terms of the plan," 29 U.S.C. § 1132(a)(1), but may lack a cognizable injury-in-fact for constitutional standing because she did not pay for her treatment. The opposite would be true for David P., who suffered an injury-in-fact by footing the bill, but would not have statutory standing because he sought benefits for his minor daughter's treatment. Under Defendant's logic, then, neither party would have standing to sue. ERISA does not countenance such a demanding standard. *See Felix*, 387 F.3d at 1161–62 (requiring only "a colorable claim for vested benefits" (citation omitted)).

allegation satisfies the first two elements of constitutional standing—that Plaintiffs were injured and that Defendants caused the injury." *Kurt W. v. United Healthcare Ins. Co.*, No. 2:19-CV-223, 2019 WL 6790823, at *3 (D. Utah Dec. 12, 2019) (unpublished). Next, if Plaintiffs prevail on their First or Second Causes of Action, they may be entitled to recover benefits due or other equitable relief in the form of surcharge or restitution that would likely redress this identified injury-in-fact. *See id.* Therefore, David P. has established both his statutory and constitutional standing to sue.

## B. Effect of the *Wit* Class Action

Defendants' Motion to Dismiss urges the court to compare Plaintiffs' Complaint with the facts and claims in a consolidated ERISA class action brought in the Northern District of California. *See Wit v. United Behavioral Health*, 317 F.R.D. 106, 141 (N.D. Cal. 2016). Defendants argue that because of the ongoing proceedings in *Wit*, "Plaintiffs' Complaint should be dismissed in its entirety and with prejudice" or in the alternative, should be stayed. ECF No. 12 at 9.

The *Wit* court certified three classes on September 19, 2016, which is over two months before Plaintiffs first sought care for L.P. at Summit and approximately two-and-a-half years before Plaintiffs filed this lawsuit. The relevant *Wit* Guideline Class is defined as:

> Any member of a health benefit plan governed by ERISA whose request for coverage of residential treatment services for a mental illness or substance use disorder was denied by [United Behavioral Health ("UBH")], in whole or in part, between May 22, 2011 and June 1, 2017, based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines.

*Wit v. United Behavioral Health*, No. 14-CV-02346-JCS, 2019 WL 1033730, at *4 (N.D. Cal. Mar. 5, 2019) (unpublished). The presiding magistrate judge in *Wit* completed a ten-day bench trial on November 1, 2017. On March 5, 2019, the *Wit* court entered findings of fact and conclusions of law, holding that United was liable to the class under ERISA because of its breach of fiduciary duty and its arbitrary and capricious denial of insurance benefits. *See id.* at *51–55.

Plaintiffs allege they are not members of the *Wit* class. Plaintiff David P. declares he has "kept careful track of mailed communications about coverage for [L.P.]'s treatment since the time she was treated" and he "did not receive any notice of a potential class action claim against [United] in the Summer of 2017 relating to [L.P.]'s treatment at Summit or Uinta." ECF No. 17–1 ¶¶ 5–6. Moreover, Plaintiffs state that they have no desire to participate in the class action and have remained committed to pursuing their claims on an individual basis. *See id.* ¶¶ 10–11.

Defendants contend that the court should dismiss or stay the Plaintiffs' case because the *Wit* lawsuit involving United has potential preclusive effects on this lawsuit and alternatively argue that the court should stay the case by abstaining under the "first-to-file" doctrine. Defendants assert that Plaintiffs' ERISA claims are purportedly "premised on the same grounds" as the claims presented in the pending *Wit* class action, and conclude that "it is well-established that members of a certified plaintiff class in a class action lawsuit are not entitled to bring separate individual actions." ECF No. 12 at 9. Plaintiffs respond that *Wit* has no preclusive effect on their case because the claims involve different defendants, theories of liability, legal claims, and time periods. ECF No. 17 at 3. Moreover, Plaintiffs argue they should not be subject to the *Wit* class action proceedings because they did not receive notice of their putative membership in the class and therefore had no opportunity to opt out. *Id.* The court concludes that, at this time, *Wit* does not justify entering a stay or dismissing Plaintiffs' claims because *Wit* is an ongoing dispute with no formal preclusive effects and the circumstances do not support abstaining in deference to the first-filed *Wit* class action.

### 1.  Preclusive Effects of *Wit v. United Behavioral Health*

First, the court recognizes that under basic *res judicata* principles, "a judgment in a properly entertained class action is binding on class members in any subsequent litigation." *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984). But applying *res judicata* in a

subsequent action requires "a valid, final judgment on the merits" concerning the overlapping matter that was actually litigated in the prior class action. *Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011); *see also Allen v. McCurry*, 449 U.S. 90, 94 (1980) (recognizing that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action").

To date, the *Wit* court has not entered a final judgment on the merits. On March 5, 2019, Chief Magistrate Judge Joseph Spero entered findings of fact and conclusions of law, ruling that the claims administrator is liable to the class under ERISA for its breach of fiduciary duty and for its arbitrary and capricious denial of benefits. *See Wit*, 2019 WL 1033730, at *51–55. But that is not a final judgment, and the *Wit* court is currently presiding over motions regarding the appropriate remedy and potential class decertification.[4] Indeed, Defendants concede that at this stage, the *Wit* case has merely provided "a non-final . . . order." ECF No. 21 at 9. Although Defendants correctly point out that the potential preclusive effects of the *Wit* class action "cannot be predetermined," *id.* at 2, this court has found no legal authority—much less that it is "well-established," as Defendants argue—to suggest that a parallel, pending class action precludes this litigation or warrants dismissal with prejudice.[5] Thus, the *Wit* class action currently has no formal

---

[4] *See Wit et al v. United Behavioral Health et al*, 3:14-cv-02346 (N.D. Cal. May 21, 2014), Court Docket Nos. 425 and 426 (hereinafter "*Wit* Dkt. No.").

[5] On this point, Defendants rely on *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1984), and *Harrison v. Lewis*, 559 F. Supp. 943 (D.D.C. 1983), but neither case supports their argument that the anticipated outcome in *Wit* mandates dismissing or staying this distinct individual action. *See Michael W. v. United Behavioral Health*, No. 2:18-CV-00818-JNP, 2019 WL 4736937, at *7–8 (D. Utah Sept. 27, 2019) (unpublished) (analyzing *Cooper* and *Harrison* and concluding that the cases did not hold that individual claims should be dismissed or stayed in favor of a parallel class action).

preclusive effects on the Plaintiffs' claims and the court declines to dismiss or stay the case on these grounds.[6]

### 2. First-to-File Abstention Doctrine

Defendants do not say so explicitly, but they also appear to argue that the court should dismiss or stay this case based on the Tenth Circuit's quasi-abstention "first-to-file" doctrine. *See* ECF No. 12 at 17–18.[7] Although "no precise rule" has developed to govern when abstention is proper between two federal district courts addressing parallel litigation, *see Colo. Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), the Tenth Circuit has adopted a "first-to-file" equitable rule to avoid duplicative or inconsistent rulings, *Wakaya Perfection, LLC v. Youngevity Int'l, Inc.*, 910 F.3d 1118, 1124–27 (10th Cir. 2018); *see also Hospah Coal Co. v. Chaco Energy Co.*, 673 F.2d 1161, 1163 (10th Cir. 1982) (recognizing "the general rule that when two courts have concurrent jurisdiction, the first court in which jurisdiction attaches has priority to consider the case"). Similar to *Colorado River* abstention applicable to parallel state and federal

---

[6] The court recognizes that if the *Wit* court proceeds to a final judgment, Defendants may then argue that the *res judicata* analysis should unfold differently. To avoid any potential preclusive effects of the outcome in *Wit*, Plaintiffs may be able to request a late opt out from the *Wit* court. *See, e.g., Michael W.*, 2019 WL 4736937, at *11 (discussing cases concerning motions for leave to file for a late opt out directed to the class action court).

[7] Defendants rely on a different federal district court decision from the Southern District of New York that stayed an individual ERISA action pending the resolution of the *Wit* class action. *See Richard K. v. United Behavioral Health*, No. 18CV6318GHWBCM, 2019 WL 3083019, at *7 (S.D.N.Y. June 28, 2019), *report and recommendation adopted*, No. 1:18-CV-6318-GHW, 2019 WL 3080849 (S.D.N.Y. July 15, 2019) (unpublished). That case is inapposite here. First, *Richard K.* does not bind this court because it is an unpublished, non-precedential report and recommendation that a Second Circuit district court adopted. Second, and relatedly, *Richard K.* largely lacks persuasive value because it applies the Second Circuit's version of first-to-file abstention, but this court is bound to apply the Tenth Circuit's abstention doctrine espoused in *Wakaya Perfection LLC v. Youngevity Int'l, Inc.*, 910 F.3d 1118 (10th Cir. 2018), which does not cite any Second Circuit authority. Third, the Defendants here seek dismissal with prejudice under its parallel litigation arguments, but the *Richard K.* court explicitly rejected that outcome. *See* 2019 WL 3083019, at *8–9. Therefore, the court does not rely on *Richard K.* in analyzing the propriety of dismissing or staying this case.

litigation, the first-to-file rule "'permits,' but does not require, a federal district court to abstain from exercising its jurisdiction in deference to a first-filed case in a different federal district court." *Wakaya*, 910 F.3d at 1124 (citation omitted). The rule is a discretionary doctrine, resting on principles of comity and conserving judicial resources "to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Buzas Baseball, Inc. v. Bd. of Regents of Univ. Sys. of Georgia*, 189 F.3d 477, 1999 WL 682883, *2 (10th Cir. 1999) (unpublished) (internal citation and quotations omitted).

In applying the first-to-file doctrine, the court "cannot resort to a 'rigid mechanical solution.'" *Wakaya*, 910 F.3d at 1124 (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)). Rather, the court considers equitable factors bearing on the prudence of abstaining in a subsequently filed case: "(1) the chronology of events, (2) the similarity of the parties involved, and (3) the similarity of the issues or claims at stake." *Id*. But these considerations are not exhaustive, and other equitable factors may "merit not applying the first-to-file rule in a particular case." *Id.* at 1127 (quoting *Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 789 (6th Cir. 2016)). "If the court in the second-filed case decides the proper course is to abstain under the first-to-file rule, it may stay the case, transfer it to the first filed court, or, in rare cases, dismiss the case entirely." *Michael W.*, 2019 WL 4736937, at *9 (citation and quotations omitted). Based on material differences between the parties and the claims in this case and in *Wit*, as well as the equitable considerations at play, the court declines to abstain under the first-to-file doctrine.

### i) Chronology of Events

First, the court compares the chronology of events in the two concurrent cases. In the Tenth Circuit, "'the first court in which jurisdiction attaches has priority to consider the case' and

jurisdiction 'relates back to the filing of the complaint.'" *Wakaya*, 910 F.3d at 1124 (quoting *Hospah Coal Co.*, 673 F.2d at 1163). Here, the *Wit* plaintiffs filed their class action claims on May 21, 2014. Plaintiffs filed this lawsuit on April 3, 2019. *See* Compl. at 1. This factor favors giving priority to the *Wit* court. *See Wakaya*, 910 F.3d at 1124 n.4.

### ii)    Similarity of the Parties and the Issues or Claims at Stake

Second, the court considers whether the two cases "bear substantial overlap in (1) the parties and (2) the issues or claims." *Wakaya*, 910 F.3d at 1126. The parties "need not be perfectly identical, and the issue must only be substantially similar in that they seek like forms of relief and hinge on the outcome of the same legal/factual issues." *Michael W.*, 2019 WL 4736937, at *9 (internal citations and quotations omitted). When the first-filed case is a class action and the second-filed case is an individual claim, the first-to-file rule counsels in favor of abstention when the class action "covers substantially the same parties and issues and has the potential to completely resolve" the subsequent individual claim. *Baatz*, 814 F.3d at 790. Although the plaintiffs in *Wit* and in this case have substantial overlap, the defendants, issues, and claims do not. Therefore, deference to the first-filed class action proceedings is not warranted here.

### a)    *Overlap of the Parties*

The defendants in this case and *Wit* do not substantially overlap. The principal defendants for the respective plaintiffs' causes of action are the claims administrators, which are two different entities. United Behavioral Health ("UBH") is the claims administrator in *Wit* and United Healthcare Insurance Company ("United") is the claims administrator here. Although both are subsidiaries to the parent company UnitedHealth Group, UBH and United are not the same entity, and Defendants have presented no evidence to show why UBH and United substantially overlap. *See David S. v. United Healthcare Ins. Co.*, No. 2:18-CV-803, 2019 WL 4393341, at *3 (D. Utah

Sept. 13, 2019) (unpublished) (denying the presence of substantial overlap between the parties because the defendant had provided "no explanation as to whether the defendant in the class actions—United Behavioral Health—is the same entity as United [Health Insurance Company] for purposes of the first-to-file rule"). In addition, Plaintiffs acknowledge in their Complaint that United and UBH may be "affiliate[d]," but Plaintiffs' allegations recognize that United and UBH do not have substantial overlap because Plaintiffs assert that United and UBH act in different capacities. *See* Compl. ¶ 7. Therefore, the defendants in *Wit* and in this case do not substantially overlap because they are separate entities that act in different capacities.

Plaintiffs here and the plaintiff class in *Wit* have substantial overlap for purposes of the first-to-file doctrine. When a class action is the first-filed suit, "the comparison is to the class members, not to the named representatives," to determine if the plaintiffs substantially overlap. *Michael W.*, 2019 WL 4736937 at *10 (collecting cases). Plaintiffs contend that they are not members of the *Wit* class—and by implication are not substantially overlapping parties for purposes of the first-to-file analysis—because Plaintiffs attest that they never "received any notice of a class action" and never had an opportunity to opt out. *See* ECF No. 17 at 3, 6. However, because the first-to-file abstention analysis merely asks whether the parties in the two cases "bear substantial overlap," *Wakaya*, 910 F.3d at 1126, the court need not decide whether Plaintiffs are actually *Wit* class members or if they are eligible to opt out of those proceedings, *see, e.g.*, *Michael W.*, 2019 WL 4736937 at *11 (finding that "putative class members who desire to opt out and pursue their claims on an individual basis must" file a motion with the class action court).[8]

---

[8] The court notes, however, that Plaintiffs' actual notice argument is likely insufficient by itself to avoid class membership. The Supreme Court has directed that absent class members "must receive notice plus an opportunity to be heard and participate in the [class action] litigation, whether in person or through counsel." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). But under Fed. R. Civ. P. 23, absent class members are only entitled to receive "the best notice that is

In *Wit*, the relevant certified class covers ERISA plaintiffs "whose request for coverage of residential treatment services for a mental illness or substance use disorder was denied by UBH, *in whole or in part*, between May 22, 2011 and June 1, 2017, based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines." 2019 WL 1033730, at *4 (emphasis added). Under this class definition, Plaintiffs here have substantial overlap with the *Wit* class in two ways. First, Plaintiffs acknowledge in their Complaint that "United, acting in its own capacity, or through its subsidiary and affiliate [UBH], . . . denied claims for payment of [L.P.'s] medical expenses in connection with her treatment at Summit and Uinta." Compl. ¶ 7. This statement shows Plaintiffs' recognition that UBH may have "in part" denied their claims, which overlaps with the *Wit* class definition's broad inclusion of members who are denied benefits "in whole or in part" by UBH. *See* 2019 WL 1033730, at *4. Second, the record demonstrates that United made its adverse benefits determination using UBH Level of Care Guidelines and criteria, *see, e.g.*, ECF Nos. 13 ¶ 7, 13–6 at 2, 14–1 at 99, 14–2 at 89, which is also a component of the *Wit* class description, *see*

---

practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort[,]" which may include notice provided through mail, electronic communications, or "other appropriate means." FED. R. CIV. P. 23(c)(2)(b); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–74 (1974) (requiring notice that is "reasonably calculated, under all the circumstances" to "all members who can be identified through reasonable effort" (citations omitted)). In the Tenth Circuit, actual receipt of notice is not necessary, so long as the "best practicable notice" was given to the absent class members. *See DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935, 944 (10th Cir. 2005) (holding that the "due process right does not require *actual* notice to each party intended to be bound by the adjudication of a representative action" (emphasis in original)); *In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1110–11 (10th Cir. 2001) (holding that a class action notice process satisfied Rule 23 and Due Process requirements, even though the record showed that only seventy-seven percent of class members actually received notice). Here, as Defendants point out, the *Wit* court was satisfied that the class administrator would provide the "best notice practicable" through a combination of U.S. mail, email, and Internet publication on two websites, despite the fact that at the time notice was given, the class administrators lacked mailing addresses for "37-38% of class members whose requests for coverage were denied in 2011–13." *Wit* Dkt. No. 263 at 2. This court will not now question the wisdom of that decision. Therefore, the court rejects Plaintiffs' actual notice arguments.

2019 WL 1033730, at *4. Regardless of the differences in legal theories between the cases or the lack of potential preclusive effects *Wit* may present (as discussed below), the broad definition of the class in *Wit* substantially overlaps with the description of Plaintiffs' circumstances here. Accordingly, the court finds that even if Plaintiffs can demonstrate they are not technically members of the *Wit* class action, an issue this court need not decide, they have substantial overlap with the class for first-to-file purposes. Because the defendants here and in *Wit* do not substantially overlap, but the plaintiffs do substantially overlap, this consideration does not weigh for or against abstention.

**b)      *Overlap of the Claims***

The next issue is whether the claims in the parallel federal cases substantially overlap. The court need not abstain in favor of the first-filed case when the two cases merely have some similarity but do not substantially overlap. *See Lipari v. U.S. Bancorp NA*, 345 F. App'x 315, 317 (10th Cir. 2009) (unpublished) (observing that the first-to-file rule "does not pertain to distinct controversies arising seriatim"); *see also David S.*, 2019 WL 4393341, at *3 (rejecting first-to-file abstention where Defendant "provides the court with no analysis of the ERISA claims each class action allows, whether Plaintiffs' ERISA claim is encompassed by the class actions, and whether the class actions include Parity Act claims"). In other words, "[t]he issues need not be identical, but they must 'be materially on all fours,'" *Baatz*, 814 F.3d at 791 (citations omitted), such that the two cases "hinge on the outcome of the same legal/factual issues," *Michael W.*, 2019 WL 4736937 at *9 (citation omitted). The court recognizes there is some similarity between the issues presented in the two cases, but Defendants have not demonstrated that Plaintiffs' ERISA denial of benefits claims, Parity Act claims, or claims for statutory penalties have sufficient overlap with the *Wit* class action to warrant abstention.

Plaintiffs in this case plead three claims under ERISA. The first is a wrongful denial of benefits claim under Section 502(a)(1)(B), in which Plaintiffs argue that Defendants improperly applied the Plan and United's medical necessity criteria, failed to act solely in L.P.'s interest, and failed to give Plaintiffs' claims a full and fair review. Compl. ¶¶ 64–67. The second is an alleged violation of the non-discrimination requirement under the Parity Act, as enforced through 29 U.S.C. § 1132(a)(3). *Id.* ¶¶ 70–74. The third is a claim for statutory penalties under which Plaintiffs allege that Defendants did not comply with ERISA's document disclosure requirements. *Id.* ¶¶ 76–78.

In *Wit*, the district court has found that the United defendants violated ERISA under two different theories of liability. First, the class plaintiffs asserted a "Breach of Fiduciary Duty Claim under 29 U.S.C. § 1132(a)(1)(B)," alleging that UBH violated its duty of loyalty, duty of care, and duty to comply with plan terms when it denied the class benefits for residential mental health and substance abuse treatment services. *Wit*, 2019 WL 1033730, at *51–54. Second, class plaintiffs asserted a wrongful denial of benefits claim under 29 U.S.C. §§ 1132(a)(1)(B)–(3)(B), alleging that UBH's denial of benefits for residential mental health and substance abuse treatment based on its internal guidelines fell below generally accepted or mandated standards of care. *Id.* at *54–55. The *Wit* court found UBH liable on both claims. *See id.* at *51–55.

The claims and issues presented in *Wit* and this case do not substantially overlap to authorize first-to-file abstention. First, even though both this case and *Wit* at the surface level involve allegations that the claims administrator wrongfully denied benefits to the insured, the actual theories of liability are distinct. In *Wit*, the denial of benefits claim is "based on the theory that UBH improperly adjudicated and denied [the class plaintiffs'] requests for coverage by using its overly restrictive Guidelines to make coverage determinations." 2019 WL 1033730, at *5. In

other words, the *Wit* class argues, and the district court has found, that UBH claims administrators wrongfully denied benefits to the class by using medical necessity criteria that were invalid because the criteria were "more restrictive than generally accepted standards of care." 2019 WL 1033730, at *55. Here, by contrast, Plaintiffs at this point have not challenged the facial validity of the medical necessity criteria that United used in this case. Rather, Plaintiffs argue that the way in which United *applied* its purportedly valid medical necessity criteria violates ERISA because the United claims administrators wrongfully applied more strict criteria than the Plan provides, violated their fiduciary duty under 29 U.S.C. § 1104(a)(1) to "act solely in [L.P.'s] interest" when reviewing Plaintiffs' claim for benefits, and failed to meet their obligations under 29 U.S.C. § 1133(2) to provide a "full and fair review" of Plaintiffs' claims.[9] *See* Compl. ¶¶ 64–67. In short, while both *Wit* and this case involve allegations that the claims administrators wrongfully denied benefits to the claimants, the basis upon which these allegations rest are distinct. Therefore, the denial of benefits causes of action under 29 U.S.C. § 1132(a)(1)(B) in *Wit* and in this case do not substantially overlap for purposes of the first-to-file abstention doctrine.

Second, Plaintiffs here seek relief under 29 U.S.C. § 1132(a)(3) for alleged violations of the Parity Act. Compl. ¶¶ 70–74. The *Wit* class has made no such allegations and the district court's March 5, 2019 decision on liability does not mention the Parity Act. *See generally* 2019 WL 1033730. Indeed, Defendants recognize that "the *Wit* findings do not address claims for a violation

---

[9] Under ERISA regulations, a full and fair review "takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1251–52 (D. Utah 2016) (quoting 29 C.F.R. § 2560.503–1(h)(2)(iv)). This "requirement seeks to 'enable claimants to submit informed responses to the adverse decision and to engage in meaningful dialogue with the plan administrator.'" *Id.* at 1252 (quoting *Metzger v. UNUM Life Ins. Co. Of Am.*, 476 F.3d 1161, 1168 n.4 (10th Cir. 2007)).

of the Parity Act." ECF No. 21 at 9. Accordingly, Plaintiffs' Second Cause of Action does not have substantial overlap with the claims or issues presented in *Wit*.

Third, Plaintiffs in this case seek statutory penalties to remedy Defendants' alleged failure to comply with ERISA's document disclosure requirements. Compl. ¶¶ 76–78. The *Wit* litigation does not involve allegations that the claims administrators failed to disclose documents. Thus, Plaintiffs' Third Cause of Action does not have substantial overlap with the claims or issues presented in *Wit*.

In sum, the *Wit* class action and this suit do not have substantial overlap because they do not "hinge on the outcome of the same legal/factual issues." *Michael W.*, 2019 WL 4736937, at *9 (citation omitted); *see also Ad Astra Recovery Servs., Inc. v. Heath*, No. 18-1145-JWB, 2019 WL 917018, at *2 (D. Kan. Feb. 21, 2019) (unpublished) (declining to stay a second-filed case because it did "not appear that [plaintiff] would be bound by an outcome" in the first-filed case). Because all of Plaintiffs' claims for relief rest on different theories of liability and are likely to proceed regardless of any preclusive effects of the *Wit* decision, the court concludes that the two suits are not duplicative. Therefore, these differences counsel against deferring to the first-filed class action.

### iii) Other Equitable Considerations

Multiple other equitable factors also weigh against abstention. "After determining the sequence and similarities in the cases, courts must also determine whether any equitable considerations merit not applying the first-to-file rule in a particular case." *Wakaya*, 910 F.3d at 1127 (citations and alterations omitted). The Tenth Circuit has not delineated which "other equitable factors may bear on the inquiry." *Id.* at 1124.[10] But the *Wakaya* court explicitly left open

---

[10] The Tenth Circuit has recognized "special circumstances" in which the first-to-file rule may be eschewed. *Wakaya*, 910 F.3d at 1127. Such "special circumstances" include the need to avoid "misuse of litigation in the nature of vexatious and oppressive foreign suits," *O'Hare Int'l Bank v.*

the possibility that "the equitable factors bearing on state-federal concurrent litigation may also apply." *Id.* at 1127. Accordingly, this court has found that appropriate equitable factors include "(1) 'the avoidance of piecemeal litigation,' (2) 'the sequence in which the courts obtained jurisdiction,' and (3) 'the potential for the [first-filed] court action to provide an effective remedy for the [second-filed] plaintiff.'" *Michael W.*, 2019 WL 4736937, at *14 (quoting *Wakaya*, 910 F.3d at 1122). Here, all three of these equitable considerations factor against abstention.

First, the interest in avoiding piecemeal litigation warrants retaining jurisdiction over this entire lawsuit. The Tenth Circuit has recognized that a purpose of the first-to-file rule is "to avoid piecemeal resolution of issues that call for a uniform result." *Buzas Baseball, Inc.*, 1999 WL 682883, at *2 (quoting *Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 917 (5th Cir. 1997)). As detailed above, the overlap between the *Wit* class action and the present case is limited to at most one of Plaintiffs' three claims for relief: the wrongful denial of benefits claim. Even if the outcome in *Wit* may have some bearing on the disposition of that claim,[11] holding off on the adjudication of that claim and proceeding with Plaintiffs' other causes of action risks piecemeal litigation and further delay. This factor weighs in favor of rejecting abstention.

Next, the court also finds relevant the sequence in which the two courts obtained jurisdiction and "the potential for the [first-filed] court action to provide an effective remedy for

---

*Lambert*, 459 F.2d 328, 331 (10th Cir. 1972), to ensure the court does not reward forum shopping, *see Span-Eng Assocs. v. Weidner*, 771 F.2d 464, 470 (10th Cir. 1985), and to prevent plaintiffs from filing an anticipatory suit for declaratory judgment, *see Buzas Baseball, Inc.*, 1999 WL 682883, at *3. None of these special circumstances are present here.

[11] As stated above, *supra* at pp. 22–23, the court reiterates that because the denial of benefits claims here and the claims presented in *Wit* argue distinct theories of liability (with the *Wit* plaintiffs challenging the facial validity of United's medical necessity criteria and Plaintiffs challenging United's application of its presumptively facially valid criteria in this case), it is unlikely that the final determination in *Wit* will have a preclusive effect on Plaintiffs' denial of benefits claims.

the [second-filed] plaintiff." *Wakaya*, 910 F.3d at 1122 (citing *Fox v. Maulding*, 16 F.3d 1079, 1082 (10th Cir. 1994)). The court in a second-filed case may decline abstention "given the jurisdictional and procedural hurdles the plaintiffs face to have their claims heard in" the first-filed class action. *Baatz*, 814 F.3d at 787–88. Here, because the *Wit* proceedings began long before Plaintiffs completed their required internal appeals processes with United, Plaintiffs may not have had an opportunity to participate in *Wit* or to opt out of the class action at this late stage. The *Wit* court certified the relevant class on September 16, 2016, *see Wit* Dkt. No. 174 at 12–13, which is fully one year before Plaintiffs first filed their administrative appeal of United's denial of benefits for L.P.'s care at Summit on September 18, 2017, Compl. ¶ 21. The *Wit* court published class notices on June 20, 2017, and closed the opt-out period on July 27, 2017, *see Wit* Dkt. No. 263 at 2–3, both of which occurred before Plaintiffs had initiated their internal appeals with United. *See* Compl. ¶¶ 21, 38. The *Wit* court also completed a bench trial on November 1, 2017. *See Wit* Dkt. No. 386. In the months after this date, Plaintiffs were engaged with United in their level two appeals for benefits at both Summit and Uinta, seeking to obtain coverage through the administrative process. *See* Compl. ¶¶ 25, 47. Finally, the *Wit* court issued its findings of fact and conclusions of law on March 5, 2019, *see Wit* Dkt. No. 418, a month before Plaintiffs filed this lawsuit on April 3, 2019, *see* ECF No. 2. Thus, at every turn, Plaintiffs would have been unable to participate in the *Wit* litigation and are likely unable to do so now. As a result, abstaining here would risk erecting both procedural and substantive barriers to Plaintiffs' ability to litigate their claims. These practical encumbrances and equitable considerations counsel against abstention.

To summarize, the chronology of the two lawsuits and the substantial overlap between the plaintiffs favor abstention. On the other hand, the lack of substantial overlap between the defendants, the issues or claims, and the other equitable considerations at play weigh against

abstention. On balance, the court declines to exercise its equitable power to stay this litigation in favor of the first-filed *Wit* class action.

## C. PARITY ACT PLEADING

Defendants also move to dismiss Plaintiffs' Parity Act claims with prejudice, arguing that they are inadequately pled. Defendants advance a stringent Parity Act pleading standard and contend that "Plaintiffs' Parity Act claim should be dismissed because Plaintiffs' Complaint does not allege facts to support any of the requisite elements of a Parity Act claim" and it instead "rests on threadbare and conclusory allegations that fall far short of Plaintiffs' pleading obligations." ECF No. 12 at 9. Plaintiffs respond that their Parity Act claims are adequately pled because they have plausibly alleged that Defendants applied acute-level criteria for the sub-acute mental health/substance abuse care L.P. received at the Summit and Uinta residential treatment centers, but would have applied sub-acute criteria if L.P. had sought sub-acute medical/surgical care at analogous skilled nursing, inpatient hospice care, or rehabilitation facilities. *See* ECF No. 17 at 14. The court finds that based on the available information and the applicable Parity Act pleading standard, Plaintiffs have adequately pled their Parity Act claims to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Therefore, Defendants' Motion to Dismiss on this basis is denied.

### 1. Parity Act Legal Framework

The Parity Act, codified at 29 U.S.C. § 1185a, is an amendment to ERISA enforced by seeking equitable relief through Section 502(a)(3). *See Christine S. v. Blue Cross Blue Shield of New Mexico*, No. 2:18-CV-00874-JNP-DBP, 2019 WL 6974772, at *6 (D. Utah Dec. 19, 2019) (unpublished). Among other provisions, the Parity Act requires that an ERISA benefits plan "providing for 'both medical and surgical benefits and mental health or substance use disorder benefits' must not impose more coverage restrictions on the latter than it imposes on the former."

*Id.* (quoting 29 U.S.C. § 1185a(a)(3)(A)). This parity requirement takes two forms: (1) plan administrators may not apply treatment limitations to mental health benefits that are more restrictive than "the predominant treatment limitations applied to substantially all medical and surgical benefits" and (2) plan administrators may not apply "separate treatment limitations" only to mental health benefits. 29 U.S.C. § 1185a(a)(3)(A)(ii). As this court recently stated, "[i]n effect, the Parity Act prevents insurance providers from writing or enforcing group health plans in a way that treats mental and medical health claims differently." *David S.*, 2019 WL 4393341, at *3 (citing *Munnelly v. Fordham Univ. Faculty*, 316 F. Supp. 3d 714, 728 (S.D.N.Y. 2018) ("Essentially, the Parity Act requires ERISA plans to treat sicknesses of the mind in the same way that they would a broken bone")).

The Parity Act implementing regulations target and prohibit specific unequal "treatment limitations." *See* 29 C.F.R. § 2590.712; *see also* 29 U.S.C. §§ 1185a(a)(3)(A)(ii)–(B)(iii) (defining "treatment limitations"). Treatment limitations include "both quantitative treatment limitations, which are expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits for treatment under a plan or coverage." 29 C.F.R. § 2590.712(a). Nonquantitative treatment limitations on mental health benefits include "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness" and "[r]efusal to pay for higher-cost therapies until it can be shown that a lower-cost therapy is not effective (also known as fail-first policies or step therapy protocols)." *Id.* § 2590.712(c)(4)(ii). The Parity Act regulations further specify that all "processes, strategies, evidentiary standards, or other factors used in applying" nonquantitative treatment limitations are subject to the statute's parity requirements. *Id.* § 2590.712(c)(4)(i). The parity comparison must be between mental health/substance abuse and medical/surgical care "in

the same classification," and the regulations list six classifications: (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs. *See Id.* §§ 2590.712(c)(4)(i) & (2)(ii)(A).

Treatment limitations are not necessarily evident on the face of an insured's plan terms and may be imposed during a claims administrator's application of the plan to a given claim for benefits or type of treatment coverage sought in a specific case. Therefore, plaintiffs often must plead "as-applied" challenges to enforce their Parity Act rights when a disparity in benefits criteria occurs in application rather than in the plan terms. *See, e.g.*, *Michael D. v. Anthem Health Plans of Kentucky, Inc.*, 369 F. Supp. 3d 1159, 1175 (D. Utah 2019) (permitting as-applied Parity Act challenge); *Kurt W.*, 2019 WL 6790823, at *4 (same); *David S.*, 2019 WL 4393341, at *4 (same).

As the court has recently discussed, the Tenth Circuit has not promulgated a test to determine what is required to state a claim for a Parity Act violation, and district courts have presented varying analyses. *See, e.g.*, *Michael D.*, 369 F. Supp. 3d at 1174–75 (discussing different pleading standards); *Michael W.*, 2019 WL 4736937, at *18 (finding that "[f]or example, Plaintiffs may allege that the Plan contains an exclusion that is discriminatory on its face; the Plan contains an exclusion that is discriminatorily applied between mental health treatment and its clear medical/surgical analog; and/or that the Plan's exclusion is the result of an improper process that violates the Parity Act"). Here, however, the parties principally agree on a three-part analysis that the court will apply in this case:[12] Parity Act plaintiffs must (1) identify a specific treatment

---

[12] During oral argument on January 15, 2020, the parties referenced a four-part Parity Act pleading standard originally espoused by this court in *Michael D. v. Anthem Health Plans of Kentucky, Inc.*, *see* 369 F. Supp. 3d at 1174, which follows the test used by some district courts in other circuits, *see, e.g.*, *A.H. ex rel. G.H. v. Microsoft Corp. Welfare Plan*, No. C17-1889-JCC, 2018 WL 2684387, at *6 (W.D. Wash. June 5, 2018) (unpublished); *Gallagher v. Empire HealthChoice Assurance, Inc.*, 339 F. Supp. 3d 248, 256 (S.D.N.Y. 2018). The four-part test from *Michael D.* and the three-part test to which the parties stipulate here are materially indistinguishable, prompting

limitation on mental health benefits; (2) identify medical/surgical care covered by the plan that is analogous to the mental health/substance abuse care for which the plaintiffs seek benefits; and (3) plausibly allege a disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog. *See* ECF Nos. 12 at 18–19, 17 at 8.

Although Defendants agree that the basic framework of the above-stated three-part test is correct, they misapprehend the proper application of the test to Plaintiffs' Parity Act allegations. Properly applied, and with an understanding of the information presently available to Plaintiffs, Plaintiffs have plausibly alleged all three elements of their Parity Act claims.

### 2. Treatment Limitation on Mental Health/Substance Abuse Benefits

First, Plaintiffs must identify a treatment limitation that Defendants imposed on the type of mental health/substance abuse care L.P. received. *See Michael W.*, 2019 WL 4736937, at *19. Defendants claim that Plaintiffs have failed to demonstrate part one of the Parity Act test because Plaintiffs purportedly "do not identify any Plan terms to support their allegations—nor can they."

---

only slightly different versions of the same basic question: has the ERISA plan or the claims administrator treated benefits determinations for mental health/substance abuse care less favorably than the plan or the claims administrator treats benefits determinations for the covered medical/surgical analog. But the court notes that upon further consideration and in the absence of Tenth Circuit guidance, the stipulated three-part test that the court applies in this case may be preferred going forward for two reasons. First, almost all Parity Act decisions applying the *Michael D.* four-part test in this district offer no analysis of the first and second parts because these considerations are often not in contention, which has rendered half the test superfluous. *See, e.g.*, *K.K.*, 2020 WL 262980, at *4; *David S.*, 2019 WL 4393341, at *4. Second, the four-part test does not adequately isolate the analysis of the identified medical/surgical analog covered by the plan, which is an essential element for showing a Parity Act violation because it provides the relevant point of comparison. *See Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155, 1158–59 (9th Cir. 2018) (comparing to skilled nursing facilities); *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016) (concluding that "Congress enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental health and substance use disorders *as compared to* coverage for medical and surgical conditions." (emphasis added) (citation omitted)).

ECF No. 12 at 20. According to Defendants, this is because the Plan on its face "provides coverage for all Medically Necessary treatment at all levels of care without regard to whether a claim is medical/surgical or mental health/substance use." *Id.*at 21. This formulation is incorrect. Even assuming, without deciding, that the face of the Plan does not differentiate between the medical necessity standards used for medical/surgical care and mental health/substance abuse care, that is not the end of the analysis. Under Parity Act regulations and a long list of this court's prior decisions, Plaintiffs do not need to identify a specific unequal limitation in the terms of their benefits plan and can pursue "as-applied" challenges. *See* 29 C.F.R. § 2590.712(c)(4)(i); *Michael W.*, 2019 WL 4736937, at *18 (collecting cases). Plaintiffs must only demonstrate that the Defendants imposed "a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits . . . under the terms of the plan (or health insurance coverage) as written *and in operation*" through "any processes, strategies, evidentiary standards, or other factors" that "*are applied* . . . more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits." 29 C.F.R. § 2590.712(c)(4)(i) (emphasis added). Indeed, the Parity Act regulations recognize multiple examples where a plan's facially equal treatment limitations may "in practice" violate the Parity Act. *See id.* § 2590.712(c)(4)(iii), ex. 1, 3, & 5.

Here, Plaintiffs have alleged that United claim reviewers *applied* more stringent criteria in denying benefits for L.P.'s mental health/substance abuse residential treatment center care than it would have used if L.P. had sought analogous medical/surgical care. Specifically, Plaintiffs plausibly allege that United applied its facially neutral medical necessity requirements in a way that required them to "satisfy *acute care* medical necessity criteria in order to obtain coverage for residential treatment" for the *subacute* mental health/substance abuse care L.P. received at Summit

and Uinta. *See* Compl. ¶¶ 72–73 (emphasis added). In Defendants' adverse denial of benefits process, reviewers stated that residential treatment center care was not medically necessary for L.P. in part because she "did not want to hurt herself," "did not want to hurt others," and she was "not having any serious mental health issues." *See, e.g.*, *id.* ¶¶ 23, 35, 44. And Defendants' Level of Care Guidelines classify mental health/substance abuse residential treatment centers as providing services for "sub-acute" care. ECF No. 13–6 at 2; *see also Wit*, 2019 WL 1033730, at *17 (summarizing generally accepted standards of care and concluding that "partial hospitalization . . . differs from residential treatment . . . in that it is an acute, crisis-focused level of care"). Thus, Plaintiffs sufficiently identify a specific treatment limitation on mental health/substance abuse benefits: the application of acute-level medically necessary criteria to benefits determinations for a subacute level of care.

### 3. Analogous Covered Medical/Surgical Care

Second, Plaintiffs must identify medical/surgical care that is covered by the Plan and analogous to the mental health/substance abuse care L.P. received. *See Kurt W.*, 2019 WL 6790823, at *5. Defendants claim that Plaintiffs have not properly identified a "specific medical or surgical analog[] to the treatment" L.P. received in the residential mental health and substance abuse programs at Summit and Uinta. ECF No. 12 at 21. Defendants argue that Plaintiffs have "vaguely identif[ied] a broad category of medical services" and that identifying "a category of intermediary services is insufficient to state a valid Parity Act claim." *Id.* at 22. However, the question of what medical/surgical care is analogous to the type of mental health/substance abuse care for which Plaintiffs sought benefits—residential inpatient treatment—is not up for debate. As this court recently recognized in *Kurt W. v. United Healthcare Insurance Company*:

> The Final Rules under the Parity Act state, in no uncertain terms, that "[b]ehavioral health intermediate services are generally categorized in a similar fashion as analogous medical services; for

> example, residential treatment tends to be categorized in the same
> way as skilled nursing facility care in the inpatient classification"
> and that "if a plan or issuer classifies care in skilled nursing facilities
> or rehabilitation hospitals as inpatient benefits, then the plan or
> issuer must likewise treat any covered care in residential treatment
> facilities for mental health or substance user disorders as an inpatient
> benefit."

2019 WL 6790823, at *5 (quoting Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008; Technical Amendment to External Review for Multi–State Plan Program, 78 Fed. Reg. 68,247 (Nov. 13, 2013) ("Final Rules")); *see also Danny P.*, 891 F.3d at 1158 (agreeing that "coverage at residential treatment facilities must, indeed, be like the coverage at skilled nursing facilities"). Moreover, this court has also consistently analogized mental health/substance abuse residential treatment centers to medical/surgical inpatient hospice and rehabilitation facilities. *See K.K.*, 2020 WL 262980, at *4; *Michael W.*, 2019 WL 4736937, at *19; *Timothy D. v. Aetna Health & Life Ins. Co.*, No. 2:18CV753DAK, 2019 WL 2493449, at *4 (D. Utah June 14, 2019) (unpublished).

Here, Plaintiffs' Complaint identifies the analogous covered medical/surgical treatment setting as a "skilled nursing facilities, inpatient hospice care, and rehabilitation facilities." Compl. ¶ 72. Defendants do not dispute that the Plan covers this type of medical/surgical treatment, and the Plan documents suggest that such care is covered. *See* ECF No. 14–1 at 50, 71, 99. Therefore, Plaintiffs have sufficiently identified the relevant medical/surgical analog covered by the Plan.

### 4. Plausible *As-Applied* Disparity Between the Specified Treatment Limitations on Mental Health/Substance Abuse Care and Treatment Limitations on the Covered Medical/Surgical Analog

Third, Plaintiffs must plausibly allege a disparity between the specified treatment limitation applied to the mental health/substance abuse services for which they sought benefits as compared to the treatment limitations applied to the covered medical/surgical analog. *See, e.g.*, *Timothy D.*, 2019 WL 2493449, at *3–4. Defendants argue that Plaintiffs' Complaint is "devoid of any

comparisons between the limitations imposed on mental health/substance treatments and those on medical/surgical" analogs and regardless, Plaintiffs cannot satisfy the third part of the Parity Act analysis because "the plan terms offered coverage for both medical and mental health services." ECF No. 12 at 24. But this conclusion both misapplies the appropriate pleading standard for part three of the Parity Act analysis and misreads Plaintiffs' Complaint. Defendants' proposed standard again ignores Plaintiffs' ability to allege an as-applied Parity Act violation. For an as-applied challenge, it is irrelevant that "the plan terms offered coverage for both medical and mental health services." In addition, Defendants themselves acknowledge that Plaintiffs at this stage must only "plausibly allege a disparity in the limitation criteria" applied to the residential treatment center care L.P. received as compared to analogous medical/surgical services. ECF No. 12 at 19.

Based on the available information, Plaintiffs have sufficiently pled a disparity that violates the Parity Act. First, Plaintiffs allege that Defendants disparately applied acute-level criteria to benefits for care at a mental health/substance abuse residential treatment center, *see* Compl. ¶¶ 72–73, which the Plan characterizes as a "sub-acute facility-based program," ECF No. 13–6 at 2, 13. The allegation that United improperly used acute-level criteria to deny benefits for L.P.'s residential treatment center care is plausible because, according to United's level of care guidelines, the criteria that United claims reviewers applied in this case are instead the criteria United claims reviewers should use when the insured seeks benefits for more intensive, acute-level inpatient care in a "structured hospital-based program which provides 24-hour/7-day nursing care, medical monitoring, and physician availability." *Id.* at 16–17. In other words, the criteria United claims reviewers applied to deny L.P.'s subacute care at the Summit and Uinta residential treatment centers—lack of suicidal ideation, lack of violence toward others, lack of serious cognition impairment—are actually the same acute criteria that United's Level of Care Guidelines indicate

should be applied to the higher, acute-level mental health care offered in an inpatient hospital setting. *See id.*

Next, Plaintiffs also plausibly contend that Defendants would not have applied acute-level criteria if L.P. sought benefits for analogous medical/surgical treatment in an inpatient hospice facility, skilled nursing facility, or inpatient rehabilitation facility, which the Plan lists as examples of "non-acute care." ECF Nos. 14–1 at 71, 14–2 at 63. Although Plaintiffs do not specify with precision what criteria Defendants apply to benefits determinations for the identified analogous medical/surgical services, it is impossible for them to do so. The Defendants have failed to disclose this information despite Plaintiffs' repeated requests, *see, e.g.*, Compl. ¶¶ 22, 30, 34, 77, and Defendants admit they have not produced this information to date.[13] Accordingly, the court recognizes that the Parity Act "counsels against a rigid pleading standard" because of the disparity of information between Plaintiffs and Defendants regarding the treatment limitations United applies to the analogous medical/surgical care that Plaintiffs did not seek. *Michael W.*, 2019 WL 4736937, at *18 (quoting *Bushell v. UnitedHealth Grp. Inc.*, No. 17-cv-2021-JPO, 2018 WL 1578167, at *6 (S.D.N.Y. March 27, 2018) (unpublished)). Indeed, this court has repeatedly acknowledged that Parity Act claims "generally require further discovery to evaluate whether there is a disparity between the availability of treatments for mental health and substance abuse disorders and treatment for medical/surgical conditions." *Id.* (quoting *Timothy D.*, 2019 WL 2493449, at *4);

---

[13] Although Defendants have attached to their briefing copies of certain Plan documents and the United Level of Care Guidelines for Residential Treatment Center, notably absent from this production are the guidelines or criteria United uses to make benefits determinations for the analogous medical/surgical care that the Parity Act regulations identify, such as "skilled nursing facilities or rehabilitation hospitals." Final Rules, 78 Fed. Reg. 68,247 (Nov. 13, 2013). This information is essential to Plaintiffs' ability to prove a Parity Act violation. Therefore, this court cannot evaluate whether Defendants have complied with the Parity Act without the criteria applied to the relevant point of comparison, and further discovery is needed. *See K.K.*, 2020 WL 262980, at *5 (allowing discovery to obtain the defendants' criteria for the medical/surgical analog).

*see also Melissa P. v. Aetna Life Ins. Co.*, No. 2:18-CV-00216-RJS-EJF, 2018 WL 6788521, at *4 (D. Utah Dec. 26, 2018) (unpublished) (observing that "[d]iscovery will allow [plaintiff] to learn and compare the processes, strategies, evidentiary standards, and other factors [the claims administrator] used for sub-acute care in both" mental and medical healthcare coverage contexts). Therefore, Plaintiffs are not required to point to a specific criteria disparity with the precision Defendants' proposed test demands, and they have adequately alleged a treatment limitation disparity based on the available information at this stage.

In sum, Plaintiffs have adequately pled their Parity Act claims because (1) Plaintiffs identified a specific nonquantitative treatment limitation in United's application of acute-level criteria to a benefits claim for subacute mental health/substance abuse care at residential treatment centers; (2) Plaintiffs appropriately (based on Parity Act regulations) analogize to medical/surgical care at skilled nursing, inpatient hospice, or inpatient rehabilitation facilities that are covered by the Plan; and (3) Plaintiffs plausibly allege a treatment limitation disparity that Defendants applied acute-level criteria to subacute mental health/substance abuse services, but would have applied subacute level criteria to the analogous subacute medical/surgical services.

### D.  STATUTORY PENALTIES

Plaintiffs' Third Cause of Action alleges that they are entitled to an award of statutory penalties under ERISA because United failed to provide Plan documents, policies, and criteria upon repeated request. Compl. ¶ 63. The relevant ERISA provision states:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100

a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1)(B). ERISA further provides:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

*Id.* § 1024(b)(4). ERISA defines "Administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated." *Id.* § 1002(16). In addition, ERISA regulations specify that "a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503–1(h)(2)(iii). Information is relevant if it:

> (i) Was relied upon in making the benefit determination;
>
> (ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination;
>
> (iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination; or
>
> (iv) In the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.

*Id.* § 2560.503-1(m)(8). Plaintiffs assert that "United[,] acting as agent of MSCHRO, failed on six separate occasions to provide a copy of the Plan Documents in spite of David's repeated requests." Compl. ¶ 63. Although it appears that United failed to provide Plaintiffs "reasonable access to, *and*

copies of" the requested Plan documents,[14] Plaintiffs' claim for statutory penalties is without merit because their document requests were not directed to the correct party under ERISA: the plan administrator.

Plaintiffs do not dispute that the Plan clearly designates MSCHRO as the plan administrator. *See* ECF Nos. 14–1 at 207, 14–2 at 199. The Tenth Circuit has repeatedly emphasized that "ERISA requires plan administrators to respond to informational requests by plan participants," and that "[s]uch causes of action may be brought only against designated plan administrators." *Thorpe v. Ret. Plan of Pillsbury Co.*, 80 F.3d 439, 444 (10th Cir. 1996); *see also McKinsey v. Sentry Ins.*, 986 F.2d 401, 405 (10th Cir. 1993) ("[S]tatutory liability for failing to provide requested information remains with the designated plan administrator"). In *Thorpe*, the Tenth Circuit concluded that the relevant statutory language "is unambiguous and admits of no other interpretation," and rejected a statutory penalties claim against a party other than the specifically designated plan administrator. 80 F.3d at 444. Because Plaintiffs directed their documents requests to United, the claims administrator, and not to MSCHRO, the plan

---

[14] Defendants point out that each of United's adverse benefits determinations directed Plaintiffs to find certain plan documents online. *See* ECF Nos. 13–1 at 4, 6; 13–2 at 4, 6; 13–3 at 4, 6; 13–4 at 4, 6; 13–5 at 4, 7. But Defendants cite no authority suggesting that posting documents online would comply with Defendants' document disclosure requirements under 29 U.S.C. 1132(c). The court notes that a Proposed Rule by the Employee Benefits Security Administration would, if adopted, "allow plan administrators who satisfy specified conditions to provide participants and beneficiaries with a notice that certain disclosures will be made available on a website." *See* Default Electronic Disclosure by Employee Pension Benefit Plans Under ERISA, 84 FR 56894-01 (proposed Oct. 23, 2019) (to be codified at 29 C.F.R. pt. 2520). But this pending rule has not displaced the clear requirements in the statute that ERISA plan administrators must comply with proper document requests "by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request." 29 U.S.C. § 1132(c)(1)(B). Thus, under the current legal framework, it is irrelevant for the statutory penalties issue that United posted certain Plan documents on websites available to Plaintiffs.

administrator, Plaintiffs' requests did not trigger the ERISA disclosure requirements and therefore do not warrant imposing statutory penalties.

Plaintiffs argue that although MSCHRO is the plan administrator and they made their requests to United, the claims administrator, their requests were proper because United was "acting as agent of MSCHRO" when it "failed on six separate occasions to provide a copy of the Plan Documents in spite of David's repeated requests." Compl. ¶ 63. However, Plaintiffs point to no binding or persuasive authority to support this argument, and the court has found no such authority in the Tenth Circuit. Plaintiffs correctly highlight that the Tenth Circuit in *McKinsey v. Sentry Insurance Company* ruled that "[i]f in practice, company personnel other than the plan administrator routinely assume responsibility for answering requests from plan participants and beneficiaries, . . . the actions of the other employees may be imputed to the plan administrator." 986 F.2d at 404. But Plaintiffs fail to recognize that *McKinsey* merely permits imputing the actions of *other employees* in the plan administrator's same company to the plan administrator for purposes of document disclosures if those other employees have assumed the plan administrator's disclosure responsibilities. *See id.* Here, by contrast, United and Morgan Stanley are separate companies, and beyond conclusory allegations that United is an "agent" of MSCHRO, *see* Compl. ¶¶ 3, 10, 63, 76, 78, Plaintiffs have not identified why the actions (or inaction) of United may be imputed to MSCHRO. Rather, Plaintiffs' claims appear to bear closer resemblance to the argument that United is the "*de facto* [plan] administrator" for purposes of ERISA documents disclosure requirements, which is a rationale for statutory penalties that the Tenth Circuit explicitly rejected in *McKinsey*. *See* 986 F.2d at 404–05. Therefore, Plaintiffs' statutory penalties argument under 29 U.S.C. § 1132(c) is dismissed with prejudice.

## IV.    ORDER

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED IN PART. Plaintiffs' Third Cause of Action for statutory penalties under 29 U.S.C. § 1132(c) is dismissed with prejudice. In all other respects, Defendants' motion is DENIED.

Signed February 7, 2020

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge